## HINTON *v.* MARTIN.

### Opinion delivered January 16, 1922.

1. APPEAL AND ERROR—CONCLUSIVENESS OF VERDICT.—Where evidence was conflicting as to whether an indorsement on a check was conditional, a verdict determining that fact is conclusive.

2. APPEAL AND ERROR—PRESUMPTION WHERE INSTRUCTIONS NOT SET OUT.—Where the instructions of the court are not set out in the abstract, it will be presumed that the issue was correctly submitted to the. jury.

3. VENDOR AND PURCHASER—MERCHANTABLE AND MARKETABLE TITLES.—Under a contract providing for return to the purchaser of a deposit if designated attorneys should find the title defective and not merchantable, the word "merchantable" is synonymous with "marketable."

4. SPECIFIC PERFORMANCE—TITLE BY ADVERSE POSSESSION.—Where a contract of sale of an oil lease provided for return of a deposit and deed if certain attorneys should find the title "defective and not merchantable," the attorneys' opinion that the title was "good and indefeasible," *held* to bind purchaser to perform, though the vendor's title was based on adverse possession.

Appeal from Union Circuit Court; *Charles W. Smith,* Judge; affirmed.

*Mahoney & Yocum,* for appellant.

In arriving at the intention of parties to a contract, it must be construed as a whole and not from some particular word or words. 130 Ark. 381. A purchaser is entitled to a marketable title in the absence of a stipulation to accept a different title. 85 Ark. 289; 120 Ark. 69. Where a "good and valid deed of conveyance" was provided for, *held,* the purchaser was entitled to a marketable title. 21 Ark. 298. The same conclusion was reached by the court in the following cases: 44 Ark. 145; (a deed of conveyance in fee of the legal title of, in and to said tract of land and appurtenances); 63 Ark. 549 (a good and sufficient title in fee simple) citing 120 N. Y. 253.

A marketable title is, "a clear record title." 120 Ark. 76; 51 N. Y. Supp. 828. See also 121 Ark. 482.

The parties did not agere to abide by the opinion of Marsh and Marlin.

A purchaser is not concluded by the advice of his attorney, where he was not authorized to waive objections. Devlin on Real Estate (3rd ed.) vol. 3, sec. 1529; 92 Pac. 315. The opinion of the attorneys was improperly admitted in evidence. 91 Tex. 527; 44 S. W. 819.

Instruction No. 4 giving the jury the right to pass upon the kind of title contracted for should have been given as well as No. 5, which would have submitted the construction of the contract to the jury. 129 Ark. 473; 81 Ark. 337; 35 Ark. 156.

*Powell & Smead,* for appellee.

The contract shows that the parties agreed to leave the question of title with Marsh and Marlin. The opinion of these attorneys stated that the title, "is good and indefeasible," which is more than a "merchantable" title. 33 L. Ed. 53; Bouvier's Law Dic. 3d Revision, vol. 2, p. 1532.

SMITH, J. The complaint in this case alleged that on January 28, 1921, E. C. D'Yarmitt delivered to appellee, C. M. Martin, as part payment on an oil lease, a check of D'Yarmitt, payable to appellant, Harley Hinton, drawn on the Commercial National Bank, of Muskogee, Oklahoma, in the sum of $2,500, pursuant to a contract for the sale of said lease. By the terms of said contract it was agreed that D'Yarmitt should pay the additional sum of $13,500 in payment of the balance of the purchase price of said lease upon the approval of the title thereof by Marsh & Marlin, a firm of attorneys selected to examine the title, this payment to be made by a deposit in the Bank of Commerce at El Dorado, Arkansas, and if not made on or before five o'clock of the afternoon of February 4, 1921, that D'Yarmitt should forfeit to Martin as liquidated damages the sum of $2,500 represented by said check.

An opinion was filed at the bank by Marsh & Marlin within the time limited approving the title; but D'Yarmitt failed to deposit the balance of the purchase price. Thereafter Hinton indorsed the check, which was forwarded to the bank at Muskogee for payment. The check was protested, and Hinton has been sued as an indorser.

The facts recited are undisputed, but there is a controversy as to the conditions under which Hinton indorsed the check. He testified that he had no interest in the transaction and indorsed the check upon the express understanding that he was doing so solely for the purpose of enabling Martin to collect it, and upon the agreement that he should not be held upon his indorsement. Hinton is corroborated by other witnesses who were present at the time the check was indorsed. But this testimony is not undisputed. Upon the contrary, there was testimony that the indorsement was unconditional. The instructions are not set out, and it will therefore be presumed that this issue was correctly submitted to the jury, and the verdict in favor of the plaintiff Martin is conclusive of that question of fact.

It is insisted that the title to the land was not a marketable one, and that the consideration for the contract has therefore failed.

The stipulations in the contract of sale in regard to the title are as follows: It is first recited that D'Yarmitt "has agreed to purchase and pay therefor, on the approval of the title by his attorneys, Marsh & Marlin." It is then provided that the sum of $2,500 is "to be paid to the said C. M. Martin as soon as title is examined and approved by the said Marsh & Marlin." And "it is understood, however, that if the abstract of title is furnished and attorney's opinion rendered approving the title by Friday, February 4, 1921, by five o'clock, P. M. * * * " that D'Yarmitt shall pay the sum of $16,000; and that, if he fails so to do, the sum of $2,500, represented by the check, should be paid to Mar-

tin as liquidated damages. The contract contained the further recital that "It is further understood and agreed that, if the said Marsh & Marlin shall approve said title, and if the said E. C. D'Yarmitt shall pay the full and total sum of $16,000 therefor within said time, the said bank shall deliver to the said E. C. D'Yarmitt said mineral deed with the abstract of title to be deposited in said bank by the said C. M. Martin, and shall pay over said sum of money to the said C. M. Martin. It is agreed that, should the said Marsh & Marlin find said title defective and not merchantable, and their written opinion shall so state, then the sum of $2,500 so deposited by the said E. C. D'Yarmitt shall be returned to him, and the said mineral deed shall be returned to the said C. M. Martin."

Upon an examination of the title a written opinion was prepared by Marsh & Marlin to the effect that the deed deposited by Martin in the bank would convey, when delivered, a "good and indefeasible" title. It is insisted, however, that this opinion did not bind D'Yarmitt, because, as is disclosed by the abstract and also by the testimony of N. C. Marsh, of the firm of Marsh & Marlin, who examined the abstract, the title depends on the adverse occupancy of the present owner, and is not a perfect paper title.

It is insisted by appellee Martin that it is immaterial that the title, as disclosed by the abstract, is not good, for the reason that the parties, by their contract, agreed that the opinion of Marsh & Marlin should be conclusive of that question, and that firm of attorneys prepared and delivered an opinion that the title was "good and indefeasible." On the other hand, it is insisted that the recital of the contract that "it is agreed that, should the said Marsh & Marlin find said title defective and not merchantable, and their written opinion shall so state," * * * conferred on the attorneys the power and duty only of determining whether the title was defective and not merchantable and that, inasmuch

as it appears from the abstract, as well as from the testimony of the attorney who examined the abstract, that the record title was not perfect, the opinion approving the title was demonstrably erroneous and was not binding on the purchaser.

It is the insistence of appellant that, when the contract is construed as a whole, it discloses an agreement to convey a merchantable title as shown by the abstract, and that, as the title tendered was not a perfect paper title, the attorneys exceeded their authority under the contract in approving the title as having been perfected by the adverse possession of the vendor.

In other words, appellant contends that the examining attorneys ignored the rule announced by this court in the case of *Mays* v. *Blair,* 120 Ark. 69, and reaffirmed in the case of *Shelton* v. *Ratterree,* 121 Ark. 482, and that under the contract the purchaser was entitled to a merchantable or marketable title, and that the title was not a marketable one, inasmuch as it depended on the adverse possession of the vendor.

The testimony of Marsh makes it clear that he was familiar with the opinions of this court in the cases of *Mays* v. *Blair* and of *Shelton* v. *Ratterree, supra,* and that he used the term "good and indefeasible," rather than the term "marketable," because the paper title was not good.

There is nothing in the contract between the vendor and the vendee to indicate that the vendor had contracted to convey, or that the vendee had agreed to accept, anything except a marketable title. The contract provided that if the attorneys should find the title "defective and not merchantable," then the deposit of $2,500 should be returned and the trade be at an end. The word "merchantable," there used, is synonymous with the word "marketable," and is used interchangeably with it by all the courts in discussions of titles to land. Moreover, we said, in the case of *Mays* v. *Blair, supra,* that "there is an implied agreement, unless

stipulated to the contrary, that the purchaser shall receive a marketable title."

In the case of *Mays* v. *Blair* we held that a title, to be marketable, must be a clear record title, and that title by adverse possession does not constitute a marketable title, which a purchaser under an executory contract is bound to accept. That doctrine was reaffirmed in the case of *Shelton* v. *Ratterree, supra,* where we refused to enforce the specific performance of a contract because the title tendered under the contract was not a title of record, but depended upon the adverse possession of the vendor.

In view of our holding in these two cases, and of the admitted condition of the title here tendered, were the attorneys justified in distinguishing between a "good and indefeasible" title and a "marketable" title, and in accepting, for the purchaser, anything less than a title which the purchaser was entitled to demand under the contract, if there is, in fact, a difference?

It may be conceded that the parties to the contract constituted Marsh & Marlin as arbiters to determine whether the title was "defective and not merchantable." But, as the attorneys did not decide whether the title was merchantable or not, and gave an opinion only that it was "good and indefeasible," it becomes necessary to inquire whether there is, in fact, a difference between a "merchantable" or a "marketable" title and a "good and indefeasible" title, for, if there is a difference, we think it clear that the attorneys had no authority to waive the right of the purchaser to demand the "merchantable" title called for by the contract.

This question has received our most careful attention, and a majority of the court have reached the conclusion that we were in error in holding that only a clear record title could be a "marketable" title. The better reasoning, the weight of authority, and our own cases are to the contrary.

We shall not attempt here a review of the cases on the subject. The authorities hereinafter referred to cite cases (a number of which are annotated) from most of the States and many of the Federal courts, to which reference may be had by anyone who cares to pursue the inquiry further.

In Warvelle on Abstracts of Title, 4th Ed., sec. 605, it is said: ''In the absence of any stipulations to the contrary the vendor, in every contract of sale, impliedly undertakes to furnish to the purchaser a marketable title.  *  *  *  Therefore, the inquiry, what is a 'good and valid' title is pertinent in this connection. It may be briefly stated in answer, that the title disclosed should extend to show a full and perfect right to property and present possession vested in the vendor. It must also embrace the entire estate or interest sold, and that free from the lien of all burdens, charges, or incumbrances, and should not only be free from litigation, but from palpable defects and grave doubts. It should consist of both the legal and equitable titles, and be fairly deducible of record.  *  *  *

''A defect in a record title will, under most circumstances, furnish a defense to a purchaser, particularly where it affects the value of the property or would interfere with its sale, and thus render it unmarketable, but there is no inflexible rule, in the absence of stipulations to the contrary, that a vendor must furnish a perfect title of record, and it has frequently been held that defects in the record or paper title may be removed by parol evidence. Where, however, the title depends upon a matter of fact which is not capable of satisfactory proof, or, if capable of that proof, yet is not so proved, the title is not marketable and the purchaser is not obliged to take it.

''A title, to be valid, need not necessarily be deducible of record, for a prescriptive title may, under proper conditions, be as strong as a title by grant, yet such titles, unless there has been a continuous holding for at least twenty years, are always liable to defeat

from undisclosed defects, and even after the expiration of such period they may still be open to attack through claims by minor heirs, or persons under disability.''

In Maupin on Marketable Title to Real Estate, 2nd Ed., sec. 292, it is said: ''A purchaser may be compelled to take a title resting upon a hostile, adverse and uninterrupted possession, under color of title which has continued for a length of time sufficient to bar the rights of any possible adverse claimant.  *  *  *

''A title founded upon adverse possession will not be marketable unless sufficient time has elapsed to bar the rights of any person who was under disabilities, such as infancy or coverture, when the cause of action accrued.  Generally the statutes of limitations in the several States specify a time within which a person whose disabilities have been removed must assert his rights, and in some of the States it is provided that in no case, including such additional period, shall the period of limitation exceed a specified number of years. Under such a statute it has been held that the possibility of a claim by a person under disabilities could not render the title doubtful where the extreme period of limitation had elapsed. If it may be fairly inferred from the abstract that a defect arising before the period at which the abstract  commences exists, the purchaser may require that the title before that time shall be shown; but if that be not within the vendor's power the title will not be held bad upon mere suspicions.''

In Black's Law Dictionary the following definition is found: ''A 'marketable' title to land is such title as a court of equity, when asked to decree specific performance of the contract of sale, will compel the vendee to accept as sufficient. It is said to be not merely a defensible title, but a title which is free from plausible or reasonable objections.'' The definition of that term found in the other law dictionaries is not essentially different. See also, various definitions of ''marketable title'' in Words & Phrases.

In the case of *Danzer* v. *Moerschel,* 214 S. W. 849, the contract of sale required the vendor, as a condition of the sale, to deliver to the vendee "a warranty deed and an abstract showing good title" to the property involved. Construing this contract the Supreme Court of Missouri said: "The record shows, and respondent's brief concedes, that respondent's record title to a material and very substantial part of the property is bad. It may be granted that, in a suit for the specific performance of a contract for a marketable title, a title by adverse possession, if adequately proved, is sufficient to justify a judgment for the vendor. *Scannell* v. *Am. Soda Fountain Co.,* 161 Mo. loc. cit. 618, 619, 61 S. W. 889. If one contracts merely for a marketable title, he cannot insist upon the delivery of something else. It is quite true that, if the contract calls for something more or other than a 'marketable' title, the courts cannot substitute a different contract therefor. *Page* v. *Greeley,* 75 Ill. loc. cit. 405, 406. The great weight of authority supports the rule that an abstract is an epitome of the record evidence of title; that a contract calling 'for an abstract showing good title' calls for record evidence; that nothing will 'satisfy the condition no matter what the vendor's real title might be'; that 'it is not sufficient that the title is good in fact—that is, capable of being made good by the production of affidavits or other oral testimony; it must be good of record; that in such case title by adverse possession will not suffice." This case is extensively annotated in 7 A. L. R. page 1162, and many cases are cited, in the note, to the effect that a party may contract, not only for a good title, but for a title shown to be good by an abstract thereof, in which event the purchaser cannot be required to take a title which would not be good but for the fact that it has been perfected by adverse possession. But, as was said by the Supreme Court of Missouri in the case from which we have just quoted, "if one contracts merely for a marketable title, he cannot insist upon the delivery of something else."

The courts are quite generally agreed that a title is not marketable if it is too defective to support an action for the specific performance of a contract to convey; and, having held, in *Mays* v. *Blair,* that a title by adverse possession did not constitute a marketable title, we thereafter held, in *Shelton* v. *Ratterree, supra,* that the courts would not decree a specific performance of a contract for the sale of land where the title tendered was dependent upon proof of adverse possession. This last holding naturally followed from the holding in the case of *Mays* v. *Blair;* but a further consideration of that result confirms the view that we were wrong in *Mays* v. *Blair.*

In 25 R. C. L. page 276, sec. 77, of the Article on Specific Performance, it is said: "As a general rule, a court of equity will not force upon a vendee a title which he may be required to engage in litigation to defend, but it has been held in a number of cases that a title by adverse possession may be so clearly proved and be so free from doubt as to be a proper foundation for a decree for specific performance against the purchaser, in the absence of a contract for a perfect record title."

In volume 5 of Pomeroy's Equity Jurisprudence, 2nd Ed. in a note to the section (2226, sec. 804) of the chapter (XXXVIII) on Specific Performance, dealing with doubts arising from extrinsic facts or the construction of some document affecting title, there is a note numbered (6), in which the following statement appears: "A title by adverse possession is often so clear that the vendee may be compelled to accept it, unless he has expressly contracted for a good title of record." A number of cases are cited in support of the note, several of which are annotated cases. As opposed to that statement of the law, our case of *Shelton* v. *Ratterree* alone is cited. Following the citation of *Shelton* v. *Ratterree* as opposed to the rule stated, the note continues: "But such a title was held insufficient in *At-*

*tebery* v. *Blair,* 244 Ill. 263, 135 Am. St. Rep. 342, 91 N. E. 475 (record title contracted for); *Noyes* v. *Johnson,* 139 Mass. 436, 31 N. E. 767 (record title contracted for); *Ogooshevitz* v. *Arnold,* 197 Mich. 203, 163 N. W. 946, 165 N. W. 633 (contract to furnish abstract showing clear title); *Sulk* v. *Tumulty,* 77 N. J. Eq. 97, 75 Atl. 757 (evidence of adverse possession not surely available in the future); *Kohlrepp* v. *Ram,* 79 N. J. Eq. 386, 81 Atl. 1103; *Heller* v. *Cohen,* 154 N. Y. 299, 48 N. E. 527, (possession not adverse); *McLane v. Petty* (Tex. Civ. App.) 159 S. W. 891."

In 26 Am. & Eng. Enc. of Law, 2nd Ed. p. 107, it is said: "A title dependent upon adverse possession under color of title will entitle the vendor to a decree, if there is no reasonable doubt as to the nature and duration of such adverse possession and the title acquired thereby. It has been held, however, that to compel a purchaser to accept a title founded exclusively upon adverse possession, unless the facts of the case are clear and free from all reasonable doubt, would be an abuse of the powers of equity. And, of course, a title by adverse possession will not be deemed sufficient where the contract implies that the purchaser shall have a perfect record title."

In the case of *Freeman* v. *Funk,* 117 Pac. 1024, 85 Kan. 473, annotated in 46 L. R. A. (N. S.) 487, there is a very extended annotation of a note on the "use of possessory title as a weapon of offense." A sub-note deals with suits for specific performance, and the law is stated by the annotator (p. 515) as follows: "Title by adverse possession is generally held sufficient to enable the vendor to maintain an action for specific performance against a purchaser, in the absence of a contract for a perfect record title." And a number of cases are cited in support of that statement. See also, *Freedman* v. *Oppenheim,* 187 N. Y. 101, 116 Am. St. Rep. 595, 79 N. E. 841; *Conley* v. *Finn,* 171 Mass. 70, 68 Am. St. Rep. 399; Waterman on Specific Performance of Con-

tracts, p. 550; *Justice* v. *Button*, 38 L. R. A. (N. S.) 1; *Hedderly* v. *Johnson*, 42 Minn. 443, 18 Am. St. Rep. 519.

Notwithstanding the conclusion we have now reached, that a title by adverse possession may be so clear and free from doubt as to be a "marketable" title, and may therefore be the basis of a suit for specific performance of a contract to convey land; and that our holding in *Mays* v. *Blair* and in *Shelton* v. *Ratterree* to the contrary is against the better reasoning and the greater weight of authority, we would not now depart from those two cases but for the fact that a majority of the court have also concluded that those cases do not follow our own cases of *Griffith* v. *Maxfield*, 63 Ark. 548, and *Tupy* v. *Kocourek*, 66 Ark. 432. It was not the intention of the court to impair the authority of the two last-cited cases in either the case of *Mays* v. *Blair* or *Shelton* v. *Ratterree, supra.* Upon the contrary, it was the declared purpose of the court to follow them, and such is still the purpose of the court if there is a conflict in those cases, as they are the earlier cases and first announced the rule of law in this State.

In the case of *Mays* v. *Blair* we quoted and applied to the facts of that case the statement from Sugden on Vendors, p. 385, that "the title to the estate ought, like Caesar's wife, to be free from suspicion." Having applied that high standard to the title we were there reviewing, we held the title insufficient because it was not a perfect record title. In the case of *Griffith* v. *Maxfield, supra,* Judge BATTLE, speaking for the court, quoted the same statement from Sugden on Vendors and said of it: "This statement is not accurate. To defeat the enforcement of a specific performance against a purchaser, there must be something more than mere speculation, theory or possibility. The doubt as to the sufficiency of the title must be 'such as would and ought to induce a prudent man to pause and hesitate; not based on captious, frivolous and astute niceties, but such as to produce a real *bona fide* hesitation in the mind

of the chancellor." In the case of *Griffith* v. *Maxfield,* Judge BATTLE pointed out the defects existing in the title there tendered which prevented it from being marketable, and, after announcing the holding of the court that the title was not marketable, because of the defects there stated, he proceeded to say: "Another defect in the title tendered by appellees is the dower interest of the widow of George R. Maxfield, deceased, in the lot. Appellees insist that this defect has been cured by the statute of limitations. But there is nothing in the complaint to show that the widow is barred from recovering her dower by an adverse possession which continued for the statutory period." The clear implication from this statement is that the title would not have been held bad, on account of the dower interest of the widow, had it been alleged and shown that the widow was barred from recovering her dower by an adverse possession which had continued for the statutory period.

In the case of *Tupy* v. *Kocourek, supra,* the court had occasion to define a "good" title, which was done in the following language: "One who contracts and pays his money for a title to land ought to get not only a title that he can hold against all adverse comers, but one that he can hold without reasonable apprehension of its being assailed, and one that he can readily transfer, if he desires, in the market. *Irving* v. *Campbell,* 121 N. Y. 353; *Sheehy* v. *Miles,* 28 Pac. 1046; *Street* v. *French,* 35 N. E. 814; 22 Am. & Eng. Enc. Law, p. 948, note; *Griffith* v. *Maxfield,* 63 Ark. 548, and authorities cited. In common parlance, a warranty deed means a perfect title; and, in legal contemplation, when parties contract for a warranty deed, they must be understood to mean a title paramount to all others. Devlin, Deeds, sec. 937." That was a suit brought upon a promissory note, upon the payment of which Kocourek and his wife were to execute deeds to two tracts of land, one of which was claimed by Kocourek and the other by his wife. The opinion recites that "the chancellor found

that Mrs. Kocourek had title by the statute of limitations of seven years. This finding was correct." But this court found the fact to be that there was a failure of title to the tract of land claimed by Kocourek. The court held that "the contract for the sale of this land cannot be severed," and the court refused to enforce the contract as to Mrs. Kocourek, notwithstanding the title depended on adverse possession, only because the title to the other tract of land had failed.

We think the contract under review did not call for a title shown to be perfect by an abstract, but that it did call for a marketable title; and no contention is made that the title is not in fact "good and indefeasible," as stated in the opinion of the examining attorneys; and, from what we have said, it follows that there is, in fact, no difference between a "good and indefeasible" title and a "marketable" title; and the purchaser will therefore be required to accept the title under his contract.

We have many times held that our statute of limitations under which title is acquired by adverse possession is not defensive alone, but confers a title which may be enforced by suit. *Wilson* v. *Spring*, 38 Ark. 181; *Logan* v. *Jelks*, 34 Ark. 547; *Jacks* v. *Chaffin*, 34 Ark. 534; *Crease* v. *Lawrence*, 48 Ark. 312; *Stricklin* v. *Moore*, 98 Ark. 30. Such a title, when good at all, is as good as any title. The cases hold that for such a title to be marketable the proof of possession must be readily available and of a character so convincing as to leave no reasonable doubt of its sufficiency. But, when that showing is made, such a title is, in fact, marketable, unless the purchaser, by his contract, has required something more, as that the sufficiency of the title appear of record and be shown by an abstract thereof.

Adhering, as we do, to the earlier cases of *Griffith* v. *Maxfield* and *Tupy* v. *Kocourek*, the cases of *Mays* v. *Blair* and *Shelton* v. *Ratterree*, in so far as they are in conflict with what we have said herein, are overruled. *Carter* v. *Carter*, 129 Ark. 573.

The judgment of the court below is correct, and is therefore affirmed.

McCulloch, C. J. I concur in the result reached by the majority for the obvious reason that under the contract the title was to be accepted if approved by the attorneys mentioned and the title was so approved, there being no suggestion in the record of fraud or unfairness in that respect. *Whitener-London Realty Co.* v. *Ritter,* 94 Ark. 263; *LeRoy* v. *Harwood,* 119 Ark. 418.

It seems to me that the majority have gone out of the way to overrule the cases of *Mays* v. *Blair,* 120 Ark. 69, and *Shelton* v. *Ratterree,* 121 Ark. 482. Those cases constituted rules of property if there can be such a rule under the decision of this court, for they interpreted and determined the effect of executory contracts for the sale of land. *Taliaferro* v. *Barnett,* 47 Ark. 359; *Apel* v. *Kelsey,* 52 Ark. 341. The majority justify their conclusion in overruling these cases by stating that they are in conflict with certain earlier cases—*Griffith* v. *Maxfield,* 63 Ark. 548, and *Tupy* v. *Kocourek,* 66 Ark. 433. I can discover no conflict between the cases. At any rate, the two earlier cases did not decide that a purchaser under executory contract was bound to accept the title by adverse possession as a marketable title within the meaning of the contract. The effect of the opinions in those cases must, under well-settled rules of interpretation, be confined to the fact in each case and the particular points the court was called on to decide.

In *Griffith* v. *Maxfield, supra,* there was involved the question of specific performance of an executory contract for the sale of the land, and it was determined by this court that there was a defect in the record title, and that specific performance should not be decreed. After announcing this conclusion, Judge Battle, delivering the opinion of the court, called attention to the fact that there was still another defect by reason of the fact that the wife of one of the prior owners had not joined in the conveyance for the purpose of relinquishing dower, and that

that defect had not been cured by the statute of limitation. The basis of the decision in the case was, however, that there was a defect in the record title which rendered the title doubtful, and that the purchaser was not bound to accept it. In reaching that conclusion Judge BATTLE quoted from a well-known text writer the maxim that under such circumstances "the title to the estate ought, like Caesar's wife, to be free from suspicion."

In *Tupy* v. *Kocourek, supra,* there was an executory contract to sell two tracts of land, one of which was owned by the seller himself, and the other by his wife, the two joining in an inseparable contract to sell and convey to Tupy, the purchaser. The court reached the conclusion that Kocourek's record title was imperfect to the extent that the purchaser was not bound to accept it, and that as the contract was indivisible, there could be no recovery for any part of the purchase price. The opinion merely stated that the chancellor's finding that Mrs. Kocourek had title by adverse possession to the tract of land which she had undertaken to sell was correct. The court, in disposing of the case, made a statement of the law, which is as applicable now as it was then, as follows:

"One who contracts and pays his money for a title to land ought to get, not only a title that he can hold against all adverse comers, but one that he can hold without reasonable apprehension of its being assailed, and one that he can readily transfer, if he desires, in the market."

It is unnecessary to determine now where the weight of authority lies on this question, and it may be conceded that the weight is in favor of the position now taken by the majority; but the authorities are divided on the subject, and, this court having taken a position on the question, the cases should not be overruled where they have become rules of property. It certainly cannot be said that there is no reason for holding that the purchaser should not be compelled to accept a title established merely by adverse possession, for it can scarcely ever

be said that a title dependent on adverse possession established by extrinsic evidence is perfect beyond the realms of doubt. That kind of a title is generally suspicious, and it is not unlikely that one who buys it will sooner or later find that he has a lawsuit on his hands to defend his title. There are secret pitfalls in the defense of this kind of a title, for often, after a long lapse of years, it is found that there is some one under disability who has the title and is not barred by limitation.