## Dodd v. Mills.

4-9493                                                        240 S. W. 2d 25

Opinion delivered June 4, 1951.

H. A. Tucker and Wood & Chesnutt, for appellant.

B. W. Thomas and Hebert & Dobbs, for appellee.

GRIFFIN SMITH, Chief Justice. The appeal is from dismissal of plaintiff's suit to recover $5,500 she paid on the purchase price of property on Lake Hamilton. The contract stipulated that with payment of the balance of $28,970 a warranty deed showing good title, or policies of title insurance, would be furnished. After occupying the premises for several months Mrs. Dodd ascertained that restrictions running with the land limited its use to residential purposes, hence an unimpaired title could not be given. The Chancellor found that *laches* barred recovery.

Because credibility of witnesses is involved in the plea that the seller informed the buyer regarding the restrictions now complained of, it is necessary to mention some of the factual background.

In 1939 Horace M. Mills resigned as collector of county taxes in Texas. He was convicted of embezzlement and served a prison sentence. Upon release in 1941 he came to Garland county, Arkansas, and for the past few years has claimed Hot Springs as his home. Judgment for the tax shortage of $17,197.96 has not been satisfied. Appellee's mother, Mrs. Ida Mills, is a resident of Smith county, Texas. Horace handles her investments as attorney in fact. In this manner Mrs. Mills acquired, for $18,000, Lot 9 of Block D, Point Lookout subdivision.

The purchase was made in October, 1947. Horace testified that he used $1,800 of his own money, and that his mother paid the difference. Some improvements were thereafter made, but the value is not shown.

Mrs. Opal L. Dodd—a native of Nebraska, but for nine years owner and operator of a "motel" at Santa Monica, California,—came to Hot Springs in July, 1948, having sold her business. She is a widow with two children: a son 20 years of age, and a daughter two years younger. The three rented a lakeside cottage for temporary use, but immediately began scanning the newspapers to determine where desirable property could be procured. In this way Mrs. Dodd found advertisements by the Park Realty Company, with which Sam Ashabranner was at that time connected. Mrs. Dodd preferred a residence fronting Lake Hamilton with grounds suitable for cottages that might be built at reasonable costs. She thought week-end lettings would produce enough revenue to justify the enterprise as a whole. In selling the California property Mrs. Dodd had received $15,000 cash and a note for $60,000.

In 1948 Ashabranner was a licensed realtor and was actively engaged in selling the type of property Mrs. Dodd believed she wanted. He testified that the Mills estate had not been listed with his company; but remembering a conversation he had recently had with Mills, the realtor concluded he would "take a shot in the dark," and when Mrs. Dodd explained that she was not financially able to purchase another place offered at $49,000, Ashabranner took Mrs. Dodd to see Mills, who permitted an inspection of the place she later contracted to buy. Ashabranner testified that Mrs. Dodd expressed satisfaction with the place—"it was exactly what she was looking for." However, she wanted her daughter to be satisfied. A second appointment was made with Mills. Ashabranner drove out with Mrs. Dodd and with her daughter. He was not sure that the son accompanied them. Ashabranner's testimony was that when Mrs. Dodd first inspected the property Mills told her there were some building restrictions, but he wasn't certain what they were.

94

Ashabranner's testimony on this point is copied in the margin.[1]

The realtor thought he told Mrs. Dodd that she probably would not want to put up structures costing less than $2,000:—"you couldn't build anything very nice for less than that, could you?"—and she replied that he was probably correct. This, said the witness, was the substance of discussions relating to restrictions.

Horace Mills testified that when Ashabranner and Mrs. Dodd called the first time he told them the place was not for sale. Mills first met Ashabranner about a month before when some Texas prospects were brought to look at the place. Thereafter he had not seen Ashabranner until July 18th. After the informal inspection during the morning, Mrs. Dodd returned with her two children and Ashabranner. In the meantime Mills had communicated with the agent of a Mr. Foster, from whom he proposed to purchase a nearby home in the event Mrs. Dodd concluded to buy at the price he intended to ask. Mills said that because of painting requirements he reduced by $530 the $35,000 he had at first asked.

Before the Offer and Acceptance had been signed by either of the parties [said Mills] he voluntarily stated in the presence of all that the property was restricted to residential use. According to Mills, Ashabranner, at Mrs. Dodd's request, then telephoned and had the abstract verified, and "Ashabranner [came from the telephone] and quoted [the language of the restrictions as set out in the abstract] almost word for word. He didn't read from notes—just gave us the substance." The witness was quite positive that Ashabranner's discussion of

[1] Said Mr. Ashabranner: "[Mr. Mills] had told her there was a restriction on the property but he wasn't clear just what the restriction was—what she couldn't build or what she could build—so I asked him where the abstract was and he said First Federal had it and I called the First Federal and Mrs. Dodd was sitting in the room right next to the one where the telephone was, right at the door; I remember that very clearly, and I called Betty what's-her-name down at the First Federal, I don't know her last name, and had her read the restrictions from Mr. Mills' abstract to me and she did. I hung up and told Mrs. Dodd as best I could just what the restriction was, said that she couldn't build any boat landing, or couldn't build any buildings for less than $2,000 and I quoted as near as I could what she read back to me to Mrs. Dodd."

the restrictions occurred in the presence of Mrs. Dodd and her two children.

The down-payment of $4,000 was evidenced by Mrs. Dodd's check-draft on a Nebraska bank. It is dated July 20—two days later than the Offer and Acceptance, and was payable to Park Realty Company. The check was written on an Arkansas Trust Company form supplied by Ashabranner.

Mills testified that "up to that time" his discussions with Ashabranner and Mrs. Dodd had been on a cash basis; he did not know that terms were to be asked, although he consented that Ashabranner might retain a commission of $1,750, following a disagreement as to the amount.

Although Mills disclaimed any intention of selling on time-payment, he readily admitted instructing Ashabranner to apply to the First Federal Savings & Loan Association for an abstract. The Association held a $12,500 mortgage on the property.

Emphasizing his dissent from the proposal relating to credit, Mills said that Ashabranner brought Mrs. Dodd to see him the day after the Offer and Acceptance had been signed and explained why it would be necessary to make an escrow agreement. Mrs. Dodd produced letters tending to authenticate her contention that the $60,000 note was prime paper and that it could be sold upon short notice. Mills thereupon consented to a delay of 10 or 15 days.

Up to this time Mrs. Dodd had not been represented by counsel. She did not know any attorney in Hot Springs, and had to depend upon the recommendations by strangers. Ashabranner mentioned Virgil Evans,[2] to whom Mrs. Dodd applied. In consequence of a temporary understanding a joint letter was addressed to Evans August 3rd, identifying the sale, the then unpaid balance of $30,470, the execution of Mrs. Ida Mills' warranty deed and its deposit with Evans, Mrs. Dodd's prom-

[2] Mr. Evans' representation of Mrs. Dodd was professional and entirely ethical in all respects, and it is not even hinted that he acted other than for the client's best interests.

ise to pay the balance within fifteen days, and the seller's obligations to clear the property of all liens, etc.

Mills testified to conversations with Mrs. Dodd after the joint letter to Evans had been signed. He was short of money, but succeeded in procuring from Mrs. Dodd an additional $1,500 in consideration of a 30-day extension. The new agreement was prepared by Mills and dated August 27th. In the meantime he had received from Evans as escrow agent the deed executed by his mother and held under the joint letter contract of August 3rd. Evans was leaving for two weeks and expected the deal to be closed during his absence. As a matter of fact, Mrs. Dodd had employed Evans to go to California and sell the $60,000 note—a mission he successfully performed. In connection with the extension agreement, Mills testified: "We talked it over and they agreed to pay $1,500 more if I'd give them additional time—thirty days to sell the note—which was all right with me." Other than the conversation Mills said he had in the presence of Ashabranner, Mrs. Dodd, and her two children, nothing touching the restrictions had been mentioned—"nothing was said about it when we closed the deal."

Mills testified that he owed certain obligations—including $18,000 to a bank at Jackson, Miss.,—and that he had pledged $183,000 worth of securities. Half of these were later sold for $20,000.

After the contract of August 3d had been made Mrs. Dodd took possession of the lakeside property and kept it until September of the following year—a period of thirteen months; but in February preceding the surrender in September, Mrs. Dodd told Mills she would not go through with the deal. Mills said that Mrs. Dodd told him she wasn't going to get out until he refunded $3,000. "This was the latter part of February, [but] I had spoken to her two or three times—from January till then."

On cross-examination Mills was asked why, if the reservations were explained to Mrs. Dodd, nothing was

said in either of the three writings concerning them. Referring to the Offer and Acceptance, Mills replied: "That was just an interest in the sale: I didn't consider it a sale—not final; it was just an agreement." When asked whether he was familiar with oil leases and real estate transactions Mills replied that he had been working along those lines since he was 17 years of age—"I've had plenty of experience." Question: "So you are a man of wide experience on trades involving the exchange and sale of property, . . . [yet] you signed [this statement]: 'It is understood that the owner or owners shall furnish complete abstract showing good title, or policies of title insurance.' Now you signed that, binding you to give [Mrs. Dodd] her complete abstract of title—giving her good title with no restrictions or conditions, didn't you?" A. "I didn't see anything about restrictions or conditions in there." Q. "You said, 'complete abstract, showing good title?'" A. "I did give her abstract showing good title." Q. "You call it—with the restrictions in there—a good and complete title?" A. "I accepted it that way for residence. . . . I didn't tell Mr. Evans anything about restrictions. He had the abstract."

Mrs. Dodd testified very positively that when discussing the property with Mills and Ashabranner she told them it would be necessary, if the transaction went through, to sacrifice the $60,000 note, that she intended to build cottages to be rented, and that Mills walked over the place with her. Pointing to specific locations, he said, "You can put one here, another here, and one over there." And he then added, "in fact, I've been [contemplating?] doing that myself——putting in a retaining wall in there to hold for the second row of cottages." Ashabranner, she said, went to the telephone after inquiry had been made regarding restrictions, then came back with the statement: "There are no restrictions: you can build what you like here."

Dennis, Mrs. Dodd's son, testified that he had listened to his mother's testimony "about seeking a place on which to establish a tourist court or motel for an

income.'' The tentative contract was signed in Mills' home. Both Mills and Ashabranner assured his mother that there were no building restrictions. They stressed the point by saying that Vance Bryant was building, ''and you could see by the work that he had done that a lot of money was invested, and that a man of his standing wouldn't put that [amount] of money [in such a project] if there were restrictions.'' Ashabranner, he said, went to the telephone, put in a call, then returned and gave the assurances mentioned by Mrs. Dodd. The witness was quite definite in explaining that his mother told Mills she intended to build cottages with two rooms and a bath, ''to help along with financial requirements.''

Unless it can be said that the testimony of Mills and Ashabranner should be accepted in preference to that of Mrs. Dodd and her son, then the first definite information Mrs. Dodd had that the land was burdened with restrictions came in February, 1949, when Mrs. H. E. Addie, a neighbor, spoke of the deed requirements. Mrs. Addie's property was in the same subdivision and restrictions were the same as those applicable to the Mills property. It is undisputed that when Mrs. Addie procured an abstract and pointed to the limitations, Mrs. Dodd promptly stated that she would not go through with the deal—that she couldn't afford to risk losing what she had accumulated in California.

A careful reading of Mills' testimony and a comparison with Ashabranner's explanation of restriction discussions will disclose that Mills was far more declaratory than was the realtor. Ashabranner, after mentioning the telephone call, said that he told Mrs. Dodd ''as best I could'' just what the restrictions were. He then told Mrs. Dodd that she ''couldn't build a commercial boat landing, [and] couldn't build buildings for less than $2,000.'' As he remembered the circumstances, Mrs. Dodd replied that she would not want to put up a building costing less than $2,000. But the word ''commercial,'' as used by Ashabranner, applied to boat landings. A rational construction of Ashabranner's statement would be: ''You can't construct any building costing less than

$2,000, and you are prohibited from constructing a commercial boat landing at any price.'' [Deed restrictions are shown in the margin].[3]

While the Chancellor did not declare a factual finding regarding affirmative disclosures Mills claims to have made, we think the testimony supports appellant's contention that the essential information was not given. Assuming that Ashabranner did mention the $2,000 limitation and the restrictions against commercial boat landings, the most one can say for what was thereby divulged is that buildings costing less than $2,000 were prohibited, while [inferentially] a structure meeting the minimum requirements could be utilized for any non-forbidden purpose.

Although Mrs. Dodd was not without business experience, she at least was a stranger in Hot Springs, and the preliminary negotiations were carried on in circumstances where she was without the benefit of a disinterested advisor. The situation must have been known to Mills, who bargained to sell the place for nearly double what he paid for it less than a year before. There is no evidence that the improvements he made amounted to anything like the added value, or that a normal real estate market accounted for the difference. This, however, is not a matter that concerns us except to the extent that it may explain the seller's conduct in granting time extensions and in not pressing for legal relief when it became apparent that the buyer did not intend to consummate the contract.

Both the majority and dissenting opinions in *Hinton* v. *Martin,* 151 Ark. 343, 236 S. W. 267, discuss the vices

[3] "The further consideration is that said premises shall be used exclusively for residential purposes and that no commercial boat landing, house, building or other structure, save outhouses incident to such house, building or other structure, shall ever be placed or erected upon the lands or premises herein conveyed, either by the grantee herein or by his heirs, executors, administrators, privies, or assigns, unless it be a house, building or other structure of four rooms or more, and costing not less than $2,000 and in case of any violation of the above conditions, then this deed shall be null and void, and the said land and premises shall absolutely revert to the grantor herein, his successors or assigns, and no act or omission upon the part of any of the latter shall be a waiver of enforcement of the conditions."

in title justifying rejection by a purchaser. The result of all of the cases is a legal policy requiring the seller to convey that which the technical words used in a deed have been construed to include. In the case at bar the term "good title" unquestionably meant a title free of substantial restrictions or limitations—a construction not questioned by appellee. The question is not whether such an estate was owned by Mills, for admittedly it was not; but, rather, whether Mrs. Dodd, with knowledge of the restrictions, chose to buy the property; or, secondly, did her conduct in not promptly offering to surrender possession work such a hardship upon Mills that he should be permitted in all good conscience to retain the cash payments?

Mills testified that he made demands for possession some time in December, but Mrs. Dodd asked for permission to stay for a while—"she thought she could work it out." This occurred about Christmas, 1948. Mills thought the next conversations occurred in March, around income-tax time; and, said the witness, this was the first time Mrs. Dodd indicated she was not going through with the deal. He later said that he had spoken to Mrs. Dodd "two or three times from January," and when she did not move he employed a lawyer.

In his answer and cross-complaint Mills did not plead *laches*, estoppel, or waiver. Appellant's attorneys say that the first intimation regarding such a defense came when the cause was being argued before the Chancellor, hence, under the holding in *Barrett* v. *Durbin,* 106 Ark. 332, 153 S. W. 265, the plea should not be permitted here.

The record presents a case where the advantage of information, values, and the relative position of parties were so clearly favorable to Mills as to require clear and convincing proof that in accepting the written contract Mrs. Dodd did so with full knowledge of the limited title held by Mills. In this respect the testimony was insufficient. The test would be whether a suit for specific performance could be maintained.

By the weight of evidence Mrs. Dodd's first knowledge of the restrictions came when Mrs. Addie procured

her own abstract and pointed out the limitations. It then became Mrs. Dodd's duty to surrender possession, which she did not do until Sept. 3, hence she is chargeable with damages from February 10, or six months and 23 days. She paid insurance amounting to $382, but received a refund of $39, so the net outlay was $343. Interest on the payments of $4,000, and $1,500, is claimed, and an item of $300 for repairs is included in appellant's computations. In view of party relationships the interest and charges for repairs should not be allowed, but the insurance payment should be a credit against damages to be computed on a rental basis.

Appellee testified that "if all of the property could be rented it ought to bring in $350 per month. Actually, in 1950, appellee rented for a period of six months (beginning in February) for $1,250, or $208.33 per month. On this basis the damage for six months and 23 days would be $1,409.71, or $1,066.71 after payment of insurance. Deducting this sum from appellant's two checks would leave $4,433.29 for which appellant should have judgment.

Reversed with directions to enter a decree not inconsistent with this opinion.